UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | Docket No. 1:23-cr-10122-1 |
| ROBERT A. KENNEDY | ) ) ) | |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Defendant Robert A. Kennedy, through his counsel, respectfully submits this memorandum in connection with his sentencing scheduled for January 4, 2024. Mr. Kennedy requests that this Honorable Court impose a sentence of 24 months of probation, consistent with the Sentencing Guidelines calculation agreed to by the parties. In light of the restitution and forfeiture Mr. Kennedy has agreed to, as well as his personal history, such a sentence is "sufficient, but not greater than necessary" to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2).

## PROCEDURAL BACKGROUND

Mr. Kennedy is charged with two counts of wire fraud in violation of 18 U.S.C. § 1343, which carry a maximum sentence of twenty years of imprisonment. On March 31, 2023, he was arrested and released on personal recognizance, and has successfully complied with all conditions of release.

### A. Plea agreement

In August, the parties entered a nonbinding plea agreement pursuant to Rule 11(c)(l)(B). They agreed on a total offense level of 7, based on the following calculations:

1

> a) a base offense level of 7, pursuant to USSG §2Bl.1;
>
> b) increasing the offense level by 2 based on a loss amount between $6,500 and $15,000, pursuant to §2Bl.l(b)(l),
>
> c) decreasing the offense level by 2 for acceptance of responsibility, pursuant to §3El.1.

Mr. Kennedy agreed to give up all rights to and interests in all assets subject to forfeiture. He also agreed to pay restitution in the amount of $14,275, which was the amount of loss suffered by the victim in this case: the Chestnut Street Apartments in Stoneham, Massachusetts.

The loss amount set forth in the plea agreement was tied to Mr. Kennedy's misrepresentations in connection with an application to rent a unit in the Chestnut Street Apartments in late 2022. The government agreed not to charge him with identity theft or wire fraud related to his earlier rental of a unit at Reading Commons in Reading, Massachusetts, or aggravated identity theft related to the rental of the Chestnut Street apartment. Mr. Kennedy pleaded guilty to both counts on September 21, 2023.

### B. The Presentence Report

Probation has calculated a significantly more severe sentence. The PSR started the calculation with a base offense level of 7 but increased by 6 levels for a loss amount between $40,000 and $95,000 pursuant to USSG §2Bl.l(b)(l)(D). PSR ¶39-40. Specifically, Probation stated that the loss amount was $81,035: this represented back rent and fees connected not only to the Chestnut Street Apartments, but to Mr. Kennedy's earlier rentals at Reading Commons and Mave Apartments in Stoneham, Massachusetts. PSR ¶40.

Probation increased the base offense level by an additional 2 levels for abusing a position of public trust pursuant to USSG §3B1.3, on the ground that Mr. Kennedy "met with the landlord of the Chestnut Street Apartments, introduced himself as a detective sergeant with the Stoneham Police Department, providing his business card." PSR ¶42. This resulted in an adjusted offense level of 15, 6 levels above the parties' agreed-upon calculation. PSR ¶44.[1]

Probation decreased the offense level by two levels for acceptance of responsibility pursuant to USSG §3El.l(a). PSR ¶45. It then applied a newly-enacted provision of the sentencing guidelines reducing the offense level by 2 levels because Mr. Kennedy is a Zero-Point Offender under USSG §§4Cl.l(a)(l)-(10). PSR ¶46. This yielded a total offense level of 11. PSR ¶47. Like the parties, Probation applied a Criminal History Category of I. PSR ¶51.

Mr. Kennedy submitted objections to these calculations in the initial PSR, challenging the application of the adjustment for abuse of public trust and the fraud loss calculation. The final PSR did not contain any responsive changes.

## ARGUMENT

**I.  Applicable Law**

---

[1] In apparent response to Kennedy's objection to Probation's two-point increase for abuse of trust, Probation appears to have asked the government for additional information not included in the Statement of Facts with respect to this paragraph; the government submitted a Supplemental Response to Probation Request dated December 22, 2023. While the government's supplement, in the form of presumed Jencks Act material not previously disclosed to Counsel, provided further details about Mr. Kennedy's interaction with the landlord that day, it does not materially change the essence of the exchange: that Mr. Kennedy accurately identified himself as a detective sergeant with the Stoneham Police Department, nor does it establish that Kennedy used that position to contribute in some significant way to the facilitation or concealment of the offense. See *infra*.

Under *United States v. Booker*, 543 U.S. 220, 259 (2005), the sentencing guidelines are no longer mandatory. The Sentencing Reform Act is viewed as requiring the Court to consider guidelines ranges, *see* 18 U.S.C. § 3553(a)(4), but permits it to tailor the sentence in light of other statutory concerns. These concerns include reflecting the seriousness of the offense, promoting respect for the law, providing just punishment, affording adequate deterrence, protecting the public, and effectively providing the defendant with needed educational or vocational training and medical care. 18 U.S.C. § 3553(a). Section 3553(a) further directs sentencing courts to consider the nature and circumstances of the offense; the history and characteristics of the defendant; the kinds of sentences available; the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense. *Id.*[2]

The sentencing court must compute the guidelines, which are the "starting point and the initial benchmark," but which may not be presumed reasonable. *Gall v. United States*, 552 U.S. 38, 49-51 (2007). Then, the court considers the parties' arguments, after which it makes an "individualized assessment based on the facts presented," considering all the factors under 18 U.S.C. § 3553(a). *Id*. Ultimately, the sentencing judge must select a sentence within the statutory range that is "sufficient, but not greater than

---

[2] Under *Booker,* this Court may consider certain factors that are rejected or ignored by the guidelines. Sentencing courts previously were forbidden from considering, inter alia, a defendant's history and characteristics to the extent that they involved his mental and emotional condition, USSG § 5H1.3; his education and vocational skills, *id.* at § 5H1.2; drug or alcohol dependence, *id.* at § 5H1.2; socioeconomic status, *id.* at § 5H1.10; or lack of guidance as a youth, *id.* at § 5H1.12. These factors now can support a sentence outside the guidelines.

4

necessary" to satisfy the varied purposes of punishment identified by Congress. 18 U.S.C. § 3553(a)(1); *see also* 18 U.S.C. § 3553(a)(2).

The First Circuit has summarized the central principles of the post-*Booker* and -*Gall* sentencing procedure described above:

> This sequencing necessitates a case-by-case approach, the hallmark of which is flexibility. In the last analysis, a sentencing court should not consider itself constrained by the guidelines to the extent that there are sound, case-specific reasons for deviating from them. Nor should a sentencing court operate in the belief that substantial variances from the guidelines are always beyond the pale. Rather, the court "should consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."

*United States v. Martin,* 520 F.3d 87, 91 (1st Cir. 2008) (quoting *Gall*, 552 U.S. at 52).

## II. Advisory Guidelines Calculation

This Court should adopt the guidelines calculation agreed to by the parties, which at the time of the plea agreement yielded a total offense level of 7. With the 2-point reduction for zero-point offender under USSG §4Cl.l, enacted after the parties entered the agreement, Mr. Kennedy's total offense level would be 5. Applying the undisputed Criminal History Category of I properly yields a sentence of probation, with or without the §4Cl.l deduction[3].

### A. The BOL should not be adjusted upward for abuse of trust, where Mr. Kennedy followed standard employment verification procedures.

---

[3] As discussed more fully *infra,* even if this Court were to adopt Probation's guidelines calculations over the defendant's objections, the applicable range (Zone B) allows for probation with a condition or combination of conditions requiring intermittent confinements, community confinement, or home confinement. PSR ¶85. It is respectfully submitted that in this case, imposition of such conditions would somewhat overstate the seriousness of the criminal conduct at issue here.

5

Pursuant to USSG §3B1.3, Probation imposed an upward adjustment for his role in the offense: abuse of a position of public trust, on the ground that Mr. Kennedy "met with the landlord of the Chestnut Street Apartments and introduced himself as a detective sergeant with the Stoneham Police Department." PSR ¶42. Such an adjustment was rejected by the government and not included in the plea agreement.

The Guidelines define "public trust" as a position of trust "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)." USSG §3B1.3, Application note 1. For an upward adjustment under §3B1.3 to apply, the position of public trust "must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult)." *Id.* The First Circuit directs sentencing courts to conduct a two-step inquiry into the possible applicability of an enhancement under § 3B1.3:

> First, the court must determine whether the defendant occupied a position of trust at all. If not, the inquiry ends, and no enhancement accrues. If, however, this initial query produces an affirmative response, the court must proceed to ascertain the extent to which the defendant used that position to facilitate or conceal the offense.

*United States v. Recco,* 121 F.3d 129 (1st Cir. 1998).

While police officers generally satisfy the definition of "position of trust," *United States v. Recco,* 996 F.2d 456 (1st Cir. 1993), the second requirement is unfulfilled. The conduct at issue was providing the landlord an accurate business card, and introducing himself detective sergeant with the Stoneham Police, when Mr. Kennedy toured a vacant unit at the Chestnut Street Apartments that was being offered for rent. Probation points to no evidence that he did not intend at that time to pay rent. Mr. Kennedy was, in fact, a

detective sergeant at the time and the Stoneham Police Department was his employer. This employment information would typically be requested on a standard rental application and verified.

Truthfully introducing himself as a sergeant detective with the Stoneham Police Department did not "contribute in a significant way" to facilitating the offense of wire fraud. The offense conduct does not include any statements or other communications by Mr. Kennedy that would have facilitated or concealed the offense. Indeed, imposing the § 3B1.3 enhancement here would have required Mr. Kennedy to remain silent about his truthful employment and employer if he sought to rent an apartment or engage in any commercial transactions that require[d] employment or income verification at any time during his tenure.

**B. Probation's fraud loss calculation resulting in a 6-level increase was unfairly expansive.**

The PSR states, "The victim in this case is the Chestnut Street Apartments which suffered a total loss of $14,275." PSR ¶34. This is the loss amount the parties specified in the plea agreement, resulting in a 2-level upward adjustment, as well as the amount of restitution agreed upon.

In calculating the specific offense conduct, however, Probation imposed a 6-level upward adjustment, based on a loss amount of $81,035. PSR ¶40. This was premised in part on Mr. Kennedy's actions with respect to earlier apartment rentals at Mave Apartments and Reading Commons, as uncharged relevant conduct under USSG §1B1.1(a)(1)(A).

Probation's calculation was insufficiently supported, however. Unlike the Chestnut Street rental, the Offense Conduct set forth in the PSR does not indicate that

7

Mr. Kennedy specifically used wire/electronic communications in connection with the Mave Apartments or Reading Commons rentals. Also, while Mr. Kennedy does not contest that he resided at Reading Commons, the PSR's Offense Conduct does not specifically implicate his role in preparing, reviewing, or approving the RAFT applications submitted by his girlfriend. Nor does it indicate what, if any, arrangement existed between him and his girlfriend concerning who was primarily responsible for rent payments. Accordingly, Probation's calculation of loss as to Reading Commons ($42,363 in back rent and fees) is speculative.

Mr. Kennedy urges this Court to adopt the calculation of loss agreed to by the parties: a loss amount between $6,500 and $15,000, yielding a 2-level increase pursuant to §2B1.1(b)(1). Even if the Court does consider uncharged activity in connection with prior rentals as potentially relevant, Probation's $81,035 figure should be reduced by $42,363 for Reading Commons, resulting in a combined fraud loss value of $38,672. This would yield a 4-level increase rather than the PSR's 6 levels. *Id.*

For these reasons, this Court should adopt the loss calculation set forth in the plea agreement rather than the PSR in determining the advisory guideline range.

### III. Under the Sentencing Reform Act, A Sentence of Probation Is Sufficient, But Not Greater Than Necessary, To Comply With The Statutory Purposes.

After determining the guideline range, this Court must consider whether the statutory factors warrant an ultimate sentence above or below the guideline range. *Jiménez-Beltre,* 440 F.3d at 518-19. The Supreme Court has emphasized that section 3553(a) is more than a laundry list of discrete sentencing factors; rather, it is a tapestry of factors, through which runs the thread of an overarching principle. *United States v.*

*Rodríguez,* 527 F.3d 221, 228 (1st Cir. 2008) (citing *Kimbrough v. United States,* 552 U.S. 85 (2007)). That tenet -- the "parsimony principle" -- instructs "district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Id.* (quoting 18 U.S.C. § 3553(a)). Accordingly, Mr. Kennedy requests that this Court impose a sentence of probation based on his personal history and characteristics and the purposes enumerated in the Sentencing Reform Act.

**A. Mr. Kennedy's history and characteristics warrant a probationary sentence.**

Mr. Kennedy is a 54-year-old military veteran[4] and former police detective sergeant. He served in the Stoneham Police Department for 22 years before retiring in February 2023 in connection with this case. During his lengthy career, in which he worked his way up the public safety ladder from temporary Corrections Officer with the Middlesex Sheriff's Department (MSD)[5] to a highly respected Detective Sergeant with the Stoneham Police Department, his on-the-job performance has been exemplary and unmarked by any discipline, reprimands, or complaints. Some of the numerous accolades and commendations Mr. Kennedy received during his time with the Stoneham Police Department are collected as an attachment to this memorandum.

Mr. Kennedy's devotion to the youth of his community, as well as his own children, has been a constant throughout his career, as the attached letters of support attest. While with the Stoneham Police Department, he ably served as a Community

---

[4] Mr. Kennedy joined the Army Reserves in 1988. He was honorably discharged in 1992, with the rank of E-4.

[5] Mr. Kennedy was hired by the MSD as a temporary corrections officer in 1995. By 1996, he had earned a permanent position there as a corrections officer and served with distinction for an additional five years. He then joined the Stoneham Police Department and served there for 22 years. All told, Mr. Kennedy was employed in the field of public safety for 28 years.

Policing Unit Officer at Stoneham High School, where he also volunteered his time as an assistant coach for the freshman football team. Mr. Kennedy received the Crystal Apple Award from the Stoneham School Committee for his work with students following the suicide of a high school student.

While his promotion to detective was the fulfillment of his lifelong ambition, his time in service did not come without emotional cost. One particular incident in which Mr. Kennedy ran downstairs to an ambulance while performing CPR on an infant he knew to already be deceased because of an accidental parental suffocation (the baby's sleeping father rolled over onto his five-week-old child) haunted him to such extent that he had vivid nightmares and attempted self-medication through drinking. He sought stress-management counseling, but his second marriage unraveled during this time.

Notwithstanding his substantial police salary, Mr. Kennedy became overwhelmed helping with college tuition payments for his daughter (University of Connecticut), one of his sons (Fitchburg State University), and a stepson (Wentworth Institute of Technology), and also assisting his adult children with relocation expenses and paying off legal fees and other debts.[6] In 2021, a health scare involving a brief hospitalization (based on initial fears of a stroke) prevented him from pursuing much-needed extra income from police details as he recuperated.

---

[6] Indeed, the depth of Mr. Kennedy's financial distress is evidenced by the fact that almost the entirety of his equal share of the profits from the April 2023 sale of his former home, which he split with his former wife, was depleted by his paying off past-due utilities, catching up on truck payments, partial rent payments to a former landlord, paying for storage fees, assisting in the purchase of second vehicle with his partner so they no longer have to share his truck, further tuition assistance, payment of legal fees, and classes to facilitate a career change.

Mr. Kennedy also acknowledges that during the same time period of the offense conduct, he was losing substantial sums of money at casinos due to a gambling addiction. While he was reluctant to admit to Probation that his gambling had become problematic, he now accepts that his behavior was unhealthy. Mr. Kennedy has found effective help through a problem gambling hotline. He has destroyed the cards he received from casinos and still regularly avails himself of support from the hotline; he will begin attending Gamblers Anonymous meetings as well as psychotherapy to manage his addiction. Mr. Kennedy is willing to agree to continued court-ordered attendance at Gamblers Anonymous as a specific condition of his probation.

At the same time, Mr. Kennedy is actively seeking to repair family relationships that have been damaged by his offenses, including with his two sons. He remains an involved grandparent, including assisting with medical care and transportation to appointments for his very young grandson who was born with two fingers on one hand and will require additional surgery. He also plays an active role in the upbringing of his partner's school-age son. Mr. Kennedy's partner suffers from an autoimmune disease, and he assists with her medical needs, including driving her to appointments. A sentence of probation would allow him to continue providing this support to his family members.

**B. A term of probation is appropriate even if the Court adopts Probation's advisory guideline calculation.**

Under the calculation agreed to by the parties, Mr. Kennedy's total offense level is 7; with a CHC of I, his sentencing range falls within Zone A and yields a sentence of zero to six months. In light of his personal history and what is for him substantial restitution and forfeiture, a sentence of two years' probation amply satisfies §3553's

purposes and will allow him to continue to assist his family with financial support and medical care.

As set forth in footnote 3, even if this Honorable Court adopts Probation's calculus of a total offense level of 11 (or 9, see *supra*), such that the sentence falls into Zone B, probation still is appropriate. Under USSG §5B1.1, such a sentence is authorized if "the court imposes a condition or combination of conditions requiring intermittent confinement, community confinement, or home detention as provided in subsection (c)(3) of §5C1.1." Accordingly, if the Court does adopt the loss calculation placing him in Zone B, Mr. Kennedy respectfully requests a sentence of probation which includes a condition of the *minimum* applicable duration of home detention.

## CONCLUSION

By entering into a plea agreement with the government a little more than three months after his indictment, Mr. Kennedy not only voluntarily accepted full and complete (and early) responsibility for his actions, but spared the government, the trial court, and his victims from all the attendant costs of pre-trial and trial proceedings. His sincere contrition is manifest in the fact that, as a result, his life-long ambition of becoming a police officer has been derailed and he has forfeited a job he not only earned on merit, but also truly loved, as a police detective, as well as his nearly three decades-long-career in public safety. While bridging his re-professional re-orientation with bartending jobs, he has applied for a full-time position with Federal Express in hopes of getting himself back on track towards financial solvency and positioning himself to pay off the debts he still owes as well as the mandatory restitution in this case. For these, and for all the foregoing reasons, Mr. Kennedy respectfully requests that this Honorable Court impose a sentence

of 24 months' probation, with the specific condition of attendance at Gamblers Anonymous.

Dated: December 28, 2023

                                  Respectfully submitted,

                                  ROBERT A. KENNEDY

                                  By his attorney,

/s/ R. Bradford Bailey
_____
R. Bradford Bailey, Esq.
BBO No. 549749
Brad Bailey Law, P.C.
44 School Street, Suite 1000b
Boston, MA 02108
Tel.: (857) 991-1945
Fax: (857) 265-3184
brad@bradbaileylaw.com

## Certificate of Service

I, R. Bradford Bailey, hereby certify that on this the 27th day of December 2023, 2024, I caused a true copy of the foregoing Memorandum in Aid of Sentencing to be served upon all necessary parties to this matter by virtue of electronically filing the same via the CM/ECF system.

/s/ R. Bradford Bailey
_____
R. Bradford Bailey, Esq.